UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
UNITED STATES OF AMERICA

vs.                              03-CR-64

RAFIL DHAFIR,

                          Defendant.
-------------------------------------------x

        Transcript of a Sentencing held on

October 27, 2005, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE NORMAN A. MORDUE, United

States District Judge, Presiding.

                A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  MICHAEL C. OLMSTED, AUSA
                           GREGORY A. WEST, AUSA
                           STEPHEN C. GREEN, AUSA

For Defendant:      AIELLO & CANNICK
                    Attorneys at Law
                    69-06 Grand Avenue
                    Maspeth, New York  11378
                      BY:  DEVERAUX CANNICK, ESQ.

                    JOEL S. COHEN, ESQ.
                    Attorney at Law
                    11 East Broadway
                    New York, New York  10038

                    PHILIP M. GAYNOR, ESQ.
                    Attorney at Law
                    551 Fifth Avenue
                    Suite 222
                    New York, New York  10176

                JODI L. HIBBARD, RPR, CRR, CSR
                      (315) 234-8547

*USA v. Rafil Dhafir Sentencing*                    2

1                    (Open Court, 10:13 a.m.)

2                    THE COURT:  Please be seated.  Will the clerk

3     please call the case, have counsel note their appearances.

4                    THE CLERK:  Court calls United States of

5     America versus Rafil Dhafir, Case Number 5:2003-CR-064.

6                    MR. OLMSTED:  For the United States, Mike

7     Olmsted, Steve Green, and Greg West, your Honor.

8                    THE COURT:  Good morning, Counsel.

9                    MR. OLMSTED:  Morning, Judge.

10                    MR. CANNICK:  For Dr. Dhafir, Deveraux Cannick

11    for Dr. Dhafir.

12                    THE COURT:  Morning, Mr. Cannick.

13                    MR. COHEN:  Appearing on behalf of Dr. Dhafir,

14    Joel Cohen.

15                    MR. GAYNOR:  Philip Gaynor for Dr. Dhafir,

16    good morning.

17                    THE COURT:  This matter is on this morning for

18    purposes of sentencing.  Do counsel have the presentence

19    report dated May the 17th, 2005, revised on August the 23rd,

20    2005, addendum dated August 24th, 2005, the first addendum

21    dated September the 14th, 2005, and the second addendum dated

22    October 21st, 2005?

23                    MR. OLMSTED:  We have all of those documents,

24    your Honor.

25                    MR. CANNICK:  We do, your Honor.

*USA v. Rafil Dhafir Sentencing*                                    3

1          THE COURT:  Share it with your client?

2          MR. CANNICK:  Yes, your Honor.

3          THE COURT:  All right.  In addition to the

4    presentence report, I received 41 letters regarding the

5    sentencing of the defendant, and also I was mindful of the 69

6    letters I did receive for bail during the bail application

7    proceedings during this matter.

8          Now do counsel have any objections to the

9    facts as stated in the presentence report?

10         MR. OLMSTED:  None from the Government as it

11   is currently amended.

12         THE COURT:  As of this time.  Mr. --

13         MR. CANNICK:  Your Honor, there were facts

14   that we objected to initially and some of those were resolved

15   and the others that we could not resolve, we just have them

16   there for the record, probation has them.

17         THE COURT:  Thank you, sir.  Are there any

18   objections to offense level calculations as reflected in the

19   presentence report?

20         MR. OLMSTED:  As reflected in the latest

21   addendum to the presentence report that was filed after the

22   Court's order of August 31st, we have no objection.

23         THE COURT:  Okay.  Mr. Cannick, I'm sure you

24   have an exception to the order.

25         MR. CANNICK:  Absolutely, your Honor.  And

1   your Honor, well, maybe I'm getting ahead of the Court, so

2   I'll just wait.

3                   THE COURT:  All right.  Lastly, do you agree

4   with the criminal history computation that is set forth,

5   criminal history category I?

6                   MR. OLMSTED:  The Government does, your Honor.

7                   THE COURT:  I'm sure you do.

8                   MR. CANNICK:  Yes, your Honor.

9                   THE COURT:  All right.  In that case, I'm

10   ready to hear arguments for downward departures.

11                   MR. CANNICK:  Your Honor, before we go to

12   downward departure, I said I had something with respect to

13   the guideline calculations.

14                   THE COURT:  Yes, sir.

15                   MR. CANNICK:  That I thought were two issues

16   that were still remaining.  One is the enhancement with

17   respect to national security, and the other was the abuse of

18   trust enhancement.  The abuse of trust, your Honor, we have

19   objection to that and I think we articulated that in our

20   overall papers.  But we would like to speak more directly to

21   the enhancement with respect to national security.

22                   THE COURT:  That was the enhancement on

23   2S1.1(b)(1) of the Guidelines.

24                   MR. CANNICK:  Yes, your Honor.

25                   THE COURT:  Go ahead, sir.

1          MR. CANNICK:  Your Honor, I think that if the

2     Court is relying upon the documents that were provided to it

3     by the Government, I think that reliance would be wholly

4     misplaced.  I think that it's a situation wherein the

5     Government in its papers made reference to the Court could

6     either rely on the testimony that was adduced at trial or it

7     could rely on the documents itself.  In our correspondence to

8     the Court dated October 4th, 2005, we pointed out that the

9     documentation that the Government was relying on, these were

10    notes that were taken by Dr. Dhafir as he was being debriefed

11    by someone who had inside information with respect to

12    Kurdistan and basically the individuals that the Government

13    referenced in those papers, in its papers, individuals that

14    Dr. Dhafir supposedly met and interviewed.

15          Basically, there was no meeting, there was an

16    interview of several individuals and those interviews took

17    place back in 1980, at least 20 years before the facts and

18    circumstances of this case.  The individuals that were

19    referenced, the individuals that were referenced by the

20    Government as being the founder of al fader and the prime

21    minister of the Taliban is just factually in fact not the

22    case.  Those people were not in that capacity, in fact the

23    individual that was referenced as being the prime minister of

24    the Taliban, in fact our research tells us that the

25    individuals were ran out of the country by the Taliban, and

1    the Government relying upon information that the Government,

2    United States Government back in 1980 was supporting and

3    sponsoring these individuals in Afghanistan in its effort to

4    run the Soviet Union out of Afghanistan, and Dr. Dhafir had

5    an interview with these individuals back in 1980 and the

6    interview on the tape, the videotape that was provided to

7    this court spoke about the humanitarian issues that were

8    going on in Afghanistan.

9               And I think that to rely upon interviews that

10   were taken in 1980 and saying that that's somehow compromised

11   by the doctor sending humanitarian aid to Iraq in the 19 --

12   late 1990s and early 2000, when you put those two together

13   seem not to make any sense, and certainly in no way create a

14   national security issue.

15              And when you look at the documentation that

16   was provided to the Court, the debriefing, basically one

17   individual was giving Dr. Dhafir information with respect to

18   individuals in Kurdistan and then there was a reference in

19   the Government papers that, well, clearly this shows that he

20   was giving moneys because there's a reference to HTN to give

21   moneys to Islamic organizations, that's the distinction that

22   we were hoping that the Government would in fact make on the

23   paper because in one sense they were arguing he was giving

24   moneys to Islamic groups but when you translated the document

25   from its Arabic language to English, it says Islamic

Case 5:03-cr-00064-NAM  Document 684  Filed 01/08/08  Page 7 of 44

 1      organization, the Islamic group that they were talking about

 2      was in fact a group at some point, may have been a group out

 3      of Egypt that the doctor never had any involvement with.  He

 4      had, in reference to the notes, Jamaa Islamia, a Kurdistan

 5      group.  And when that group was put on the prohibitive list

 6      by the United States Government, Dr. Dhafir had long been in

 7      jail.  So I don't see how the Court could rely upon that and

 8      make a decision to give that enhancement without having

 9      further information from the Government.  It's their burden.

10              The Government relies on *McKeeve* and *McKeeve*

11      is a case that basically speaks to an individual sending

12      computer parts to -- into a foreign country and -- in Libya,

13      knowing full well that those computer parts were going to be

14      used for munitions purposes.  *McKeeve* makes an exception for

15      humanitarian aid.  The only testimony that this court

16      received, the credible testimony this court received with

17      respect to whatever Dr. Dhafir and Help the Needy was sending

18      into Iraq was for humanitarian purposes.  *McKeeve* makes an

19      exception for humanitarian purposes.

20              For those reasons, we object to the

21      enhancement and we think that the information that was

22      provided by the Government was wholly misleading.  In fact,

23      as we get to pointing out some of the misleading information

24      that the Government gave to the Court in its sentencing

25      memorandum, some of them are minor and innocuous but they're

*USA v. Rafil Dhafir Sentencing*                    8

1    misleading and erroneous nonetheless, and as I read the

2    sentencing memorandum about -- that the Government submitted,

3    it's like the facts be damned, we don't care what the true

4    facts are, we're just going to put it here to support our

5    argument.

6              They started off by saying Dr. Dhafir came to

7    the United States in 1974.  Well, the probation report and

8    all the documentation that the Government has on Dr. Dhafir

9    showed that he came here in 1972.  Then, it gets worse where

10   they speak about, Waleed Smari testified that Dr. Dhafir

11   requested him to go to visit someone in Iraq.  That's not the

12   case at all.  Waleed Smari testified that he was in the area

13   and Dr. Dhafir said, well, if you're there, see this

14   particular individual.

15             But I want to speak more specifically to

16   glaring misstatements, total disregard for the facts that the

17   Government put in its sentencing memorandum.  One, they said

18   that on Page 12, regarding Colleen Williams, they said that

19   when his answers, as being Dr. Dhafir, "When his answers were

20   vague and inconsistent and when they were contradicted by

21   certain underlying documents and by Rafil Dhafir's answers to

22   the same questions in her meeting with him, she withdrew from

23   the work and sent the draft forms to Dhafir's -- to

24   Mr. Hatfield."

25             The Court knows that that's not in fact the

1    case.  Miss Williams told us in testimony that because the

2    Government cornered her and waved the flag for some two or

3    three days with her, she decided at that point in time that

4    she had no intention to going further with the case.  In fact

5    she said that when she met with Dr. Dhafir, she wasn't even

6    paying attention to what he said because she had made up her

7    mind that she was going to withdraw.  And to put this in the

8    paper, to urge your Honor to sentence Dr. Dhafir, it just, it

9    just -- it's just patently unfair and intellectually

10   dishonest.

11           When you go further, it mentioned that, well,

12   this investigation of Dr. Dhafir as it relates to Medicare,

13   in conducting physical surveillance of Dr. Dhafir's house

14   during May 2000, investigators noticed that Rafil Dhafir

15   seldom went to his medical practice.  He spent several hours

16   at his office on Monday, Tuesday, Wednesday, but did not go

17   to his office on Thursdays and Fridays.  Because his income

18   tax returns revealed substantial income from the medical

19   practice, investigators became suspicious of his billing

20   practice with Medicare.  You recall the testimony.  They said

21   it was a fax from Laurie Evans to Mrs. Dhafir, communication

22   between those two individuals that spoke to the incident to

23   rule, and it was because of that misunderstanding with

24   respect to the incident to rule, that's how the Medicare case

25   got started.

*USA v. Rafil Dhafir Sentencing*                                    10

1                    Now, they submit this to your Honor, and when

2    we know full well that the documents that they gave us early

3    on, they said, in those documents, that the Medicare

4    investigation of Dr. Dhafir came as a result of FBI asking

5    Medicare to conduct the investigation because they said that

6    Dr. Dhafir was overbilling Medicare, bilking Medicare and

7    using those moneys to sponsor terrorism.  Now we have this.

8    They're all over the place and it's the facts be damned, and

9    we just ask your Honor to take some of these things in

10   consideration.

11                   We went through their sentencing memorandum

12   and there are 44 instances of glaring misstatements or just

13   intellectually dishonest information.  One of the latter ones

14   that speaks to the issue of fine or restitution, giving the

15   information about the defendant's financial condition set

16   forth in the presentence investigation report, "We agree with

17   the probation office that defendant is in a position to pay

18   such financial obligations immediately."  What's so glaring

19   about that, your Honor, is that it was only until last week

20   that we faxed over the financial affidavit.  There was

21   nothing in the probation report.  They just took the

22   information and make things up as they went along as they did

23   throughout the trial.

24                   We are not here to relitigate the trial, but I

25   just wanted the Court, when it relies on information that is

1    being submitted by the Government, that I think the Court has

2    to look at it with a very jaundiced eye.  As it relates to

3    the issue with respect to enhancement of national security,

4    we urge your Honor to consider our letter dated October 4th,

5    2005.

6                    THE COURT:  I read it.

7                    MR. CANNICK:  We ask your Honor to consider

8    the testimony that was heard at trial, and consider the fact

9    that the information in those documents that were cited by

10   the Government does not stand for the proposition, and some

11   of the physical evidence that they ask your Honor to consider

12   deals with interviews taken by Dr. Dhafir in 1980, of

13   individuals who were fighting and being sponsored by the

14   United States Government to rid the Soviet Union, rid

15   Afghanistan of the Soviet Union.  And again, our issue with

16   respect to abuse of trust, we rely on our earlier papers.

17                   THE COURT:  Mr. Olmsted, would you like to

18   respond.

19                   MR. OLMSTED:  I'll respond very briefly unless

20   you have more questions, then of course I'll answer any

21   questions you would want.

22                   With respect to Colleen Williams, and I won't

23   belabor the record on this, I hope the Court --

24                   THE COURT:  I recall her testimony.

25                   MR. OLMSTED:  Is that she was stuck with Rafil

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

*USA v. Rafil Dhafir Sentencing*                    12

1    Dhafir longer than she would have otherwise done because she

2    was concerned that the Government was overreaching and so she

3    said, I gave them more breaks than normal, but it was when he

4    pulled out the file cabinet that showed years and years of

5    operation where they had told her specifically they were a

6    new organization that she began to feel uncomfortable and

7    withdrew.  That's the basis of our representations in the

8    sentencing memorandum.

9              Let me speak briefly about the enhancement for

10   national security.  The two paragraphs that we cite on the

11   *McKeeve* case I think resolve this issue.  It says, "The

12   embargo was an exercise of executive power, designed to deal

13   with an extraordinary threat to national security."  In this

14   case, your Honor, the President specifically found in 1990

15   that the government, the actions and policies of the

16   government of Iraq constituted an unusual and extraordinary

17   threat to national security.  And that was endorsed every six

18   months following that, either by a report or a specific

19   finding.  I appreciate that a lot of the public thinks of

20   this as a kind of a Republican thing, but most of the

21   findings ever found under sanctions were signed by President

22   Clinton.  This wasn't a Democrat thing, this wasn't a

23   Republican thing, it was a national security program that

24   was -- that persisted.

25              There are problems with every sanctions

*USA v. Rafil Dhafir Sentencing*                                    13

1    program, but the sanctions programs are an alternative to

2    war, and therefore, they are essential to the national

3    security of the United States, and the decision to violate

4    those sanctions violates a national security control.

5              In the *McKeeve* case the court says, in

6    essence, that ends the matter.  As we read it, the

7    enhancement applies to any offense that involves a shipment

8    or proposed shipment that offends the embargo, whether or not

9    the goods shipped are actually intended for some innocent

10   use, and the *Min* case says the same.  I believe that you can

11   rely upon your recollection of the facts that were adduced at

12   trial to conclude that Rafil Dhafir was not sending

13   humanitarian aid into Iraq, he was sending money.  And much

14   of that money wasn't even designed to purchase humanitarian

15   aid, some of it was.  But the fact is, the restriction on

16   money going into a country like Iraq is absolute, and the

17   reason is that once it gets there, it is fungible and can be

18   used for any purpose.

19             The President, all the Presidents involved in

20   this case believed that we had to have an unwavering foreign

21   policy, absolute and controlling with respect to Iraq, both

22   with respect to the government of Saddam Hussein and with

23   respect to the factions that would succeed Saddam Hussein

24   once he left power.  And so they decided as a matter of

25   national policy, as a matter of national security policy to

*USA v. Rafil Dhafir Sentencing*                    14

1    invoke these sanctions.  And the conspiracy to violate those

2    is a conspiracy to violate a national security control as a

3    matter of law, and in this case as a matter of fact.

4                And we'll also remind you that you have

5    resolved this issue on two further occasions with respect to

6    two individuals, Osameh Al Wahaidy and Ayman Jarwan, both of

7    whom we concluded believed that they were providing nothing

8    but humanitarian aid, and it would be a perversion if Rafil

9    Dhafir were to get the benefit of a -- or would not get this

10   enhancement, when he knew the truth, given that those two

11   individuals had to face that enhancement with aid or not.  If

12   you have --

13               THE COURT:  Well, just because I did that with

14   the other two doesn't mean I can't change my mind if I feel I

15   erred, but I don't feel I erred, I think I was correct in

16   that and you may have an exception, Mr. Cannick.

17               MR. CANNICK:  Thank you, your Honor.  I just

18   want to correct the record with one thing that Mr. Olmsted

19   said.  He said with respect to Colleen Williams that she said

20   she withdrew when Dr. Dhafir opened a drawer and she saw

21   these articles or these items in the drawer.  If the Court

22   recalls that interview that Dr. Dhafir had with Colleen

23   Williams was at Colleen Williams' office, she was not in

24   Dr. Dhafir's office and Dr. Dhafir never opened any drawer,

25   that was testimony of Ayman Jarwan.

*USA v. Rafil Dhafir Sentencing*                              15

1              MR. OLMSTED:  Right, it was Ayman Jarwan.

2              THE COURT:  All right.  Now we're ready on the

3    issue of downward departures.  Defense, do you wish to be

4    heard on that?  I've read your papers.

5              MR. CANNICK:  Your Honor, you've read our

6    papers on it, we're not going to belabor the record, we just

7    believe that given the facts and the circumstances of this

8    case, this case is wholly outside of the heartland of cases

9    that this court deals with on a day-to-day basis.  I think

10   that when I make my final comments to you with respect to

11   Dr. Dhafir in terms of asking you or at least speak to you

12   about the sentencing options, I will get further into it, but

13   I think this case is out of the heartland.  We cited a number

14   of circumstances where, for charitable purposes, downward

15   departure has been granted, we cited situations wherein

16   someone, facts and circumstances of the case, the criminal

17   conduct is far outweighed by the Guidelines, we'd ask you to

18   take that in consideration.

19              We'd ask you to take into consideration that

20   the law, the federal law anticipates that when someone's a

21   pretrial detainee, that he will be kept in a federal

22   facility, not like the one that Dr. Dhafir was kept in, and I

23   think that this court is keenly aware of the conditions that

24   Dr. Dhafir and his attorneys were confronted with in terms of

25   preparing for this case on a going-forward basis.  We also

1    point out the fact that he has lost his medical license, his

2    standing in the community, these are all items that the

3    courts have considered and granted downward departure on.

4    The Court has received our papers, since August 15th, you've

5    indicated you've read them, so we're certainly not going to

6    belabor the record here.

7                        THE COURT:  Thank you.

8                        MR. COHEN:  Your Honor, may I just take a

9    moment to confer with Mr. Cannick.

10                       THE COURT:  Yes.

11                       (Pause in Proceedings.)

12                       MR. CANNICK:  And your Honor, Mr. Cohen just

13   pointed out something that we did in fact discuss.  That if

14   this court was to give the enhancement with respect to the

15   national security issue, then we would ask for a downward

16   departure because of that, because this case is so much

17   unlike the *McKeeve* case.  In that case, McKeeve was aware

18   that the computer parts were going to a munition facility, he

19   understood and was aware because there were conversations had

20   with he and the other individuals throughout him sending

21   these items there that he fully appreciated his conduct, knew

22   exactly what was going on.  That's not the situation here.

23                       Despite whatever the Government is saying, the

24   only thing that we know that was going on is that Dr. Dhafir

25   sent moneys to procure meat for the adahi program and to feed

*USA v. Rafil Dhafir Sentencing*                              17

 1    other individuals and to provide medicine, clothe, food, I

 2    think the Court is well aware of their efforts to get

 3    clothing, the container into Iraq and that did go about and I

 4    would ask the Court to consider granting the downward

 5    departure to offset any enhancement that the Court might

 6    consider with respect to national security issues.

 7                    THE COURT:  Mr. Olmsted.

 8                    MR. OLMSTED:  Your Honor, obviously we oppose

 9    the downward departure on all these grounds.  We do not

10    believe that this case does fall outside the heartland.  We

11    believe that the shipment of money into Iraq, I believe you

12    can recall the reports are that Iyad sent back, Mustafa, the

13    two money couriers sent back to Rafil Dhafir to describe how

14    they spent the money, does not match the humanitarian

15    purposes that we are now hearing were the only purpose for

16    the money being sent into Iraq.  That's simply not the facts.

17                    The only matter that they address that we have

18    not already addressed on the record because I'll rely on our

19    record otherwise, is the location of the defendant's pretrial

20    detention.  As you may know, we had suggested that the

21    defendant could be moved to several other facilities to be

22    convenient either to his lawyer by moving to a federal

23    facility nearer to New York City or to another facility other

24    than Jamesville in this area, and it was the defendant's

25    choice to not seek those transfers.  I believe because -- for

*USA v. Rafil Dhafir Sentencing*                                    18

1    whatever reason, but I just wanted that to be on the record.

2    That he was not held in Jamesville because the Government

3    required him to be in Jamesville, he was held in Jamesville

4    because he was required to be held somewhere and that

5    Jamesville was the place chosen by the defense to stay.

6              Other than that, unless you have questions

7    about specific issues on which you are considering a downward

8    departure, I'll rely upon the papers that we've filed

9    already.

10             MR. CANNICK:  Just want to correct the record,

11   your Honor, maybe I came in here one day and I was fast

12   asleep and I asked the Court to keep Dr. Dhafir at Jamesville

13   and maybe I asked for that, I don't have any recollection of

14   that whatsoever.  I don't think that there's anything in the

15   record anywhere that would ever support that.  Even numerous

16   letters that I sent to this court regarding what was going on

17   with respect to the facility, we complained loud and we

18   complained early.

19             THE COURT:  And I think we accommodated you

20   pretty well, I think we -- I tried.

21             MR. CANNICK:  With what you had.

22             THE COURT:  With what I had.

23             MR. CANNICK:  But we didn't ask for him --

24   Mr. Olmsted just said I asked for him to be at Jamesville,

25   no, we said that the situation at the Justice Center and he

1    was summarily taken from the Justice Center, so -- but I

2    think, your Honor, the record and the numerous letters that I

3    sent to the Court would bear us out, I'm not going to belabor

4    this.

5                    THE COURT:  Just one second, please.

6                    (Pause in Proceedings.)

7                    THE COURT:  Okay.  I'm ready to impose the

8    sentence.  Government, do you move sentence at this time?

9                    MR. OLMSTED:  Yes, we do, your Honor.

10                   THE COURT:  You wish to be heard?

11                   MR. OLMSTED:  Yes, we do, your Honor.  We'll

12   be brief because the papers that were submitted in

13   anticipation of sentencing have been voluminous and I believe

14   provide you adequate information to impose a sentence.  I

15   would like to make a couple points simply for the record, and

16   also because I believe that they bear keeping in mind during

17   the imposition of sentence.

18                   This case is in several respects an unusual

19   case but in one major respect it is a normal case and that

20   is, it was built on the evidence fact by fact, that's why it

21   took so long to try this case.

22                   There has been some public sentiment, we

23   believe not shared in this case that we have targeted Rafil

24   Dhafir for prosecution because of his religious beliefs.

25   That is not the case.  We have litigated that pretrial, I

1  believe that as you watched the evidence unfold during trial,

2  that concern should have evaporated.  We have not prosecuted

3  this case because of who the defendant is but because of what

4  he has done.

5          And what has he done?  We believe he has lied

6  and we believe we have proved and the jury verdict confirms

7  that he lied to his donors, to the United States, to his

8  government, which is the United States government.  He's

9  convicted of making false statements to the IRS, to the INS,

10  and to the Department of Human Services -- Health and Human

11  Services.  He's lied to his banks and we believe he's lied to

12  his friends.  He pretended, as you know, to be Maher Zagha,

13  Maetham Alazawy, Muhammed Harairi, Ralph Shafir, and Osameh

14  Al Wahaidy.  His application for a visa to the Saudi Arabian

15  government, he signed in the name of Ralph Shafir.  And the

16  videotape, if you recall, of the meeting in Washington, D.C.

17  shows him and the other two trustees laughing at how they had

18  misled the IRS on who they were.  I believe his quotation is,

19  "They'll be pulling out their hair trying to find us."

20          The testimony also showed that when anybody

21  ever questioned him about what he was doing, he beat them

22  down, insisting that they simply do what he asked.

23          He did when his wife told him that they were

24  misbilling Medicare and now she's convicted.

25          He told Al Wahaidy that he needed to keep his

*USA v. Rafil Dhafir Sentencing*                                    21

1    name on the bank accounts and Al Wahaidy agreed because of

2    his loyalty to the doctor.  And now, Al Wahaidy's been

3    convicted.

4              When Jarwan met him in the parking lot, this

5    is testimony at trial, and asked him, what happens to the

6    money when it gets to Iraq, Dhafir didn't answer, he said,

7    don't you trust me?  Well, Ayman Jarwan did trust him, and

8    now Ayman Jarwan is convicted and in jail.

9              When Ahmed Ali said, I don't know if I can

10   sign this visa application because it says we're going to pay

11   him $63,000 and I want to make sure that really happens, can

12   you send me the money, Rafil Dhafir said, yes, I'll send you

13   the money, just sign it.  Ali signed it.  Dhafir never sent

14   him the money, and now Ali is convicted.

15             When the New York State Charities Bureau

16   started following up on the Somali Relief organization and

17   Help the Needy, Rafil Dhafir met with Ahmed Ali and said,

18   close your charity.  To tell --

19             THE COURT:  Somali Relief fund.

20             MR. OLMSTED:  Somali Relief fund.  To tell

21   someone who is providing aid to needy Muslims that he should

22   close their charity so the government doesn't figure out what

23   Rafil Dhafir is doing with his charity money puts the lie to

24   the claim that this is being prosecuted because of Rafil

25   Dhafir's faith.

1            I appreciate that many people see his adamance

2    as religious conviction.  We see it as simple arrogance.

3    Even though the sanctions in this case have been the focus of

4    most of the arguments made by the defense counsel, the mail

5    fraud and wire fraud of the donors has always been a

6    motivating force to the investigation and the prosecution.

7    Indeed it was the statute which we relied on at the beginning

8    of this case to justify why pen registers, tax exempt, tax

9    disclosure orders and such matters.

10           We have taken our lead from the donors.  When

11   asked, all the donors said that they would be appalled and

12   offended and angry if the donations were used for anything

13   other than helping the needy people in Iraq.  That was the

14   basis of the wire and mail fraud charges, Counts 51 to 60 on

15   which he has been convicted.

16           People who donated money at the Manlius

17   fundraiser, and you may recall we showed the videotape of

18   that fundraiser, each said when we interviewed them in

19   February of 2003 that they would feel defrauded if their

20   money did not go to the needy people in Iraq.  Many of those

21   people, your Honor, are in the room today.

22           At trial, we showed through the records that

23   the money that was provided by those people at that meeting

24   was deposited into the Oneida Savings Bank account in the

25   name of Help the Needy by Rafil Dhafir and then, forging

1    Osameh Al Wahaidy's name, the money was transferred to Maher

2    Zagha's account in Jordan.  And then following e-mail

3    direction from Rafil Dhafir to Maher Zagha, that money was

4    then paid out first to Haifal Abdullah who is the gentleman

5    who came down from Montreal to say he had been advanced

6    $65,000 and he was going to use it to pay Iraqi government

7    officials on the Oil for Food program but decided since the

8    Iraqi government didn't seem like it was there for the long

9    term, he would simply take the money and live off of it in

10   Montreal.  And another $213,000 was wire transferred from --

11   by Maher Zagha at the direction of Rafil Dhafir to Saed

12   Badawi, who is the co-owner of, and the president of Salt

13   City International, a corporation here in Syracuse owned by

14   Rafil Dhafir.

15            And if you recall the visa application that

16   the defendant submitted to the Saudi Arabian government, he

17   said I was going over to meet with Saed Badawi to set up an

18   investment company.  It had nothing to do with charity.

19            And so when imposing the sentence today,

20   applying the law to these facts, we ask you to keep in mind,

21   as I'm sure those donors have kept in mind, the images, the

22   tragic images of those children who needed help and to also

23   keep in mind that none of those children ever had a chance of

24   getting any of the money that those donors thought those

25   donors were giving.  Unless you have further questions, I'm

1    done.

2                    THE COURT:  Nothing.

3                    MR. OLMSTED:  Thank you, your Honor.

4                    THE COURT:  Mr. Cannick.

5                    MR. CANNICK:  Your Honor, I'm going to speak

6    briefly to some of the comments that were made by Mr. Olmsted

7    because I just don't think the facts as we heard them bear

8    out what he just said, none of the moneys went to the

9    children and the children didn't stand a chance of receiving

10   it.  I think that I can recall the testimony of Mr. Kolbe

11   saying, well, most of the moneys went for the adahi program

12   and that program was well documented and that was almost

13   70 percent of the moneys that the organization had, as well

14   as the other holidays where the organization sent moneys for

15   specific things.

16                    Mr. Olmsted mentioned there are people in this

17   community, in this room who were in attendance at the Manlius

18   meeting and said that they felt betrayed if they knew the

19   moneys went to some source other than that.  I don't recall

20   any of them testifying at trial, in fact there are witnesses

21   who the Government did in fact have testify at trial and they

22   asked the very same question of them, and those witnesses did

23   not give the statement or comment that Mr. Olmsted just made.

24   In fact, most of the discovery that we received with respect

25   to communications that supposed victims responded to the

*USA v. Rafil Dhafir Sentencing*                                    25

1    Government regarding the use of the moneys, at least their

2    allegation of the use of the moneys, they were not as which

3    was just articulated by Mr. Olmsted.

4              The ones who testified here in court didn't

5    articulate that, nor did the ones who sent written

6    correspondence back in response to them.  It's quite

7    contrary.  In fact most of them said that they believe that

8    Dr. Dhafir, knowing who he was, used the moneys for the

9    purposes for which he asked, and the witnesses who came and

10   testified here in court said the exact same thing.

11             The Government opened up this case on that

12   theme, that Dr. Dhafir would be shown to be a manipulator and

13   a betrayer, and the people that they called and put on the

14   witness stand said everything but that.  In fact in their

15   letter to your Honor, the sentencing memorandum, they said,

16   well, because these people did not come in and said that he

17   manipulated them and betrayed them that he must be some

18   Svengali of some sort, has some powers over them where they

19   couldn't realize what had happened to them.

20             THE COURT:  Well, I got to say, there, his

21   wife stands convicted before me, plus several of his

22   colleagues.

23             MR. CANNICK:  Yes.

24             THE COURT:  And they're -- and I recall the

25   testimony.  There is an allegiance to your client by Osameh

1    Al Wahaidy, Ayman Jarwan, those people, and the wife, there

2    is a strong, strong belief in him, and I think, and as it

3    stands right now, they're all convicted as result of the

4    conduct of your client.

5            MR. CANNICK:  Your Honor, and what really

6    concerns me about that comment is that when the Court says

7    that, then the Court in my way of thinking is saying, well,

8    if there's such a belief, then that belief is only there

9    because of some nefarious ability of my client, not that he's

10   such a person who's lived his life --

11           THE COURT:  I didn't say, I'm just saying that

12   they have a belief in him.  He is a leader within his

13   community, he is looked up to, highly respected, I didn't

14   hear anybody speak in a derogatory manner about him, even the

15   ones that stand convicted of felonies.

16           MR. CANNICK:  And there's probably a reason

17   for that.  Because he is, because he's lived his life the way

18   that he's represented himself throughout, and these people

19   have reason to know him I think far more intimately than

20   anyone else in this courtroom, and there's probably very good

21   reason as to why that allegiance is there and that loyalty is

22   there.  And I think the way that these witnesses who came in

23   and testified about what Dr. Dhafir did for them way back

24   when, before there was any Help the Needy, you remember the

25   testimony of the individual who came here to go to medical

*USA v. Rafil Dhafir Sentencing*                27

1    school and said that he was sleeping in a car and it was

2    Dr. Dhafir who came and gave him money to help him out of his

3    situation.  Witnesses after witnesses came in and testified

4    as to the good deeds of this man, well before Help the Needy.

5              THE COURT:  I know that, but there's also this

6    side of it that's very bothersome to me.  Your client has

7    insulated himself, he has bank accounts, instead of his name

8    being on them, they're in the name of Osameh Al Wahaidy,

9    they're in the name of Ayman Jarwan, they're in the names of

10   other people.  He has insulated himself, his name shows up

11   nowhere.  Even when the prosecution mentioned, I mean, when

12   he was going to go back over to Saudi Arabia, I think he used

13   Ralph Shafir as the name.

14             MR. CANNICK:  A name that he used for about 20

15   years, your Honor, and your Honor, I think that aside from --

16             THE COURT:  It just, it seems to me, I sat and

17   I heard the case, and I -- I'm of the opinion that he did

18   many, many good things, there's no question about that, and I

19   intend to take that into consideration when I sentence him,

20   but he's been convicted, and I heard the proof and I heard

21   the jury's verdict, and I think the evidence supported that

22   and I told you that when the motions were made.

23             MR. CANNICK:  Your Honor, then given what the

24   Court has just said, I'm not going to belabor the Court's

25   time with much more, but I think when you mention that there

 1    are these individuals who are close to my client, who has

 2    this belief in him, I think that the Court should take into

 3    consideration, there aren't many letters that were received

 4    from supposed victims here, but the ones that were received,

 5    if the Court reads them, these letters speak glowingly about

 6    Dr. Dhafir.

 7                 THE COURT:  I read every letter that was sent

 8    to me.  There were a couple letters, though, that didn't

 9    speak so glowingly.  He broke the hearts of some of his

10    clients, that he worked on, you recall, because they

11    questioned now whether or not he was honestly treating them

12    for the cancer that they were going through, or treating

13    their husbands, so I agree, overwhelmingly, they speak

14    glowingly of your client, there is no question about that.

15                 MR. CANNICK:  And your Honor, I'd just like to

16    mention two things and I'm going to sit down.  You mentioned

17    that there were a couple of letters that did not speak

18    favorably of Dr. Dhafir and I have those two letters because

19    I knew that there would be some reference to them.  The one

20    letter is from an individual, I'm not going to mention the

21    name but the letter basically said, we had a big loss in our

22    family, I blame Dr. Dhafir because when we needed him, he was

23    in jail, we had no medical records to fall on, and we had no

24    doctor to counsel on.  Your Honor, that was pretty much

25    Dr. Dhafir's position with respect to the Medicare issue

*USA v. Rafil Dhafir Sentencing*                    29

1   here.  There was no other doctor there as it relates to

2   incident to.  They're saying that when we needed him, he was

3   in jail.

4              The other letter's pretty much the same, and

5   what went on is that the letter then goes on to speak about

6   Dr. Dhafir, well, we're at war now, and he did these things

7   to America, and we're a hundred percent Americans.  I think

8   the other letter speaks to a misunderstanding as to what this

9   case is all about, and I think that person found themselves a

10  victim --

11             THE COURT:  She is mixed up, you can tell

12  she's emotionally, she is -- it's a lengthy, lengthy letter,

13  that one.  The other one, is that the one where there's five

14  children involved?

15             MR. CANNICK:  This is the one that I just

16  referenced.  The one that you just spoke to is of a

17  85-year-old woman who was treated by Dr. Dhafir and still was

18  alive 13, 15 years later, after she was treated with him with

19  a 50/50 chance and this letter basically says he let us down

20  because he was in jail.

21             Your Honor, I'm not going to belabor the

22  record.  You have our submissions, we have reason to believe

23  that this case is outside of the heartland, we believe that

24  the Government -- well, the Court is to consider the

25  Guidelines, but *Booker*, you're supposed to consider the total

1   bent of a man, and we ask you that when you consider the

2   total bent of a man, you do what you feel is the right thing

3   to do here.  Dr. Dhafir did not kill anyone, he did not maim

4   anyone, and we don't believe that he should be sentenced in

5   that fashion.  If he did kill someone, he killed them out of

6   kindness, out of love, and out of trying to provide food and

7   humanitarian services for them.  Thank you.

8                   THE COURT:  Thank you, Counsel.  One second.

9                   (Pause in Proceedings.)

10                  THE COURT:  Okay.  Rafil Dhafir, is there

11  anything you would like to say, sir, before I pronounce

12  sentence?

13                  MR. CANNICK:  May I have one second, your

14  Honor.

15                  (Pause in Proceedings.)

16                  THE COURT:  Mr. West, did you advise counsel

17  of your different figure on the Blue Cross Blue Shield?

18                  MR. WEST:  I did, Judge, I provided --

19                  MR. COHEN:  Your Honor, I'm sorry, Judge, may

20  we take a five-minute break in order to resolve this issue

21  with Dr. Dhafir?  Thank you very much.

22                  THE COURT:  Five-minute break.

23                  MR. CANNICK:  Your Honor, before we go, am I

24  correct that the restitution issue is still open?

25                  THE COURT:  Well, I was going to address that,

1  I just wanted to know if the probation department has shown

2  you what their figures are, and this morning, Mr. West

3  submitted to our office and I just asked him whether you were

4  advised of that, that they have lessened from 52,000 to

5  18,000.  If you want, you can submit the restitution issue on

6  papers afterwards.

7             MR. CANNICK:  Your Honor, that I think would

8  be our preference, because what probation has suggested here

9  is totally at odds with the Government's own witness Nina

10 Carosella with respect to Medicare, and we submitted Nina

11 Carosella's testimony with our sentencing memorandum, and I

12 don't know if the Court recalls her testimony, but she spoke

13 about how these things had to be first backed out, and

14 probation does not in any way do any backing out, and I don't

15 think the Government is of that position when in fact its own

16 witnesses said you had to back these things out.  And I think

17 that if we were to have any resolution of it, it has to be by

18 way of a submission or by hearing.

19            MR. COHEN:  Or both.

20            MR. WEST:  Well, Mr. Cannick continues to

21 misunderstand Miss Carosella's testimony.  She explained that

22 she was not in a position to go through the calculations

23 because that was done by Special Agent Pangallo who went

24 through and explained how she backed out the claims that were

25 inappropriate to reduce the amounts that were concluded as a

1    loss.  What the Medicaid folks have submitted and that

2    Excellus Blue Cross Blue Shield has submitted now provides

3    the Court with the losses which they incur for the payments

4    that weren't made by Medicaid when Dr. Dhafir was out of

5    office and his staff treated the patients.  They adopted the

6    same percentage reductions that Agent Pangallo did when she

7    did her analysis and their charts and figures reflect that.

8    The figures that we submitted this morning, and the new

9    charts that I provided.

10              THE COURT:  You went from 52,015.55 to

11   18,336.27 on the Excellus Blue Cross.

12              MR. WEST:  That's correct, Judge.

13              THE COURT:  Well --

14              MR. CANNICK:  There's no misappreciation that

15   I have of Nina Carosella's testimony, you have it, it speaks

16   for itself.

17              THE COURT:  Why don't I reserve then on the

18   restitution issue, we'll resolve this.

19              MR. CANNICK:  Very well, your Honor.  May we

20   have that 15 -- that five minutes.

21              THE COURT:  Yes.

22              THE CLERK:  Court stands in recess.

23              MR. COHEN:  Your Honor, may we meet with the

24   doctor in the jury room?

25              THE COURT:  Sure.

*USA v. Rafil Dhafir Sentencing*                                33

1          MR. COHEN:  Thank you very much.

2          (Whereupon a recess was taken from 10:56 a.m.

3           to 11:05 a.m.)

4          THE COURT:  Mr. Cannick, sir.

5          MR. CANNICK:  Yes, your Honor.  Your Honor,

6    Dr. Dhafir does have a statement he'd like to make.

7          THE COURT:  Please proceed, sir.

8          THE DEFENDANT:  (speaking in Arabic) Peace to

9    Allah and peace and mercy be on his prophet and all the

10   prophets after him, before him.

11          I have been incarcerated for close to a

12   thousand days and counting.  And I had to endure four months

13   of trial where misrepresentation, innuendoes, and utter lies

14   were uttered and I had to endure all this as I had no way of

15   saying anything because of the structure of the system.  And

16   since the trial ended eight months ago, I've been thinking on

17   what to say in this day that will explain some of the

18   ambiguities or answer some of the questions that were raised

19   even this morning just a few minutes ago, and I sat and wrote

20   down and rewrote and rerererewrote, and I ended up with a

21   document of about 50 pages that I wanted to present to this

22   court today.

23          But then last night, meeting with my lawyers,

24   they said that no one is going to have the attention span to

25   listen to all this, including the Judge, and they convinced

1    me to cut it down to about five or six pages which I

2    reluctantly did, knowing that a lot of facts are going to go

3    unnoticed, and a lot of deceiving and deceptions that were

4    shown during the trial by our accusers will go unchallenged,

5    but because, again, of the way the system was, I agreed to

6    it.

7              But then again, as the Court started this

8    morning, and hearing your comments, sir, I found that even

9    these five or six pages are not to be uttered, because it

10   seems, and I could be corrected, that the Court's mind have

11   already been set.  My lawyers had advised me --

12             THE COURT:  My mind is set on this, I accept

13   the jury's verdict.

14             THE DEFENDANT:  Yes.

15             THE COURT:  I am required to accept that

16   jury's verdict.

17             THE DEFENDANT:  Yes, sir.  As my lawyers have

18   pointed out to me as well as to others, is that common sense

19   has to prevail.  How would one explain that someone will pay

20   $1.4 million over the years and come up with such a

21   complicated scheme which takes a lot of effort and a lot of

22   footwork and tremendous cooperation from not one, two, three,

23   or four people, so that at the end, he will steal $300,000.

24   It makes absolutely no sense.  At least I should be given the

25   benefit of the doubt that I'm not that dumb and not that

*USA v. Rafil Dhafir Sentencing*                    35

1   stupid.

2                 THE COURT:  I think you graduated high school

3   at the age of 16 number 10 of 45,000 students.

4                 THE DEFENDANT:  45,000, sir.

5                 THE COURT:  I don't think you're stupid, sir.

6                 THE DEFENDANT:  To come up with that scheme

7   and spend $1.4 million to steal $300,000 is to be dumb and

8   I'm not that dumb.  By simple calculation, as my lawyers have

9   pointed out, that if the issue was to avoid taxes, I could

10  have paid, and I did.  But according to the Government, that

11  I tried to avoid paying $400,000.  You are good at

12  mathematics, sir, you showed us your capability, and I'm good

13  at mathematics, too, I always scored a hundred out of a

14  hundred in the 11 years that I studied mathematics.  These

15  things do not add up.  I could have paid the alleged $400,000

16  and kept a million in my pocket.  I didn't have to steal that

17  $300,000 the Government alleges.  Common sense.  Simple

18  common sense.

19                 Apologies are in order.  I first and foremost

20  apologize to my Maker for not worshipping him the way he

21  deserves and is entitled to.

22                 I apologize to the Prophet, peace be upon him,

23  for not emulating him as I should have.

24                 I apologize to my wife, who was deprived of my

25  companionship, and I of hers, because I was so entrenched in

*USA v. Rafil Dhafir Sentencing*                         36

1    helping the needy.  I thank her for understanding and not

2    complaining.  I hope I will be able to make it up to her, if

3    not in this life, then surely in the next.

4              I apologize to the Iraqi people, those who

5    were needy, for not helping more, but my hands were tied, and

6    now I'm incarcerated.

7              I apologize to my Muslim brothers and sisters

8    for not spending enough time helping them with their fears,

9    and to them, I wish I can turn back and look them in the eye

10   and talk to them, but I know the Marshals will not allow me,

11   and tell them don't ever believe that I would let you down or

12   that I would lie to you or that I will misappropriate the

13   funds that you trusted me with.  Not then, not now, not ever.

14   It is not in me, and that is not me.  Whatever else people

15   from our accusers' side want to say, that's their problem.

16   But the truth stands as it is.

17             I apologize also to those who have faith in

18   me, supported me in all forms and avenues and who believe in

19   my innocence.  I apologize to them that I failed to convince

20   the decision makers of my innocence, as I don't know how to

21   lie and twist the facts, and I wish that what people believe

22   on the outside is the same as what had been transpired inside

23   this court.  Thank you.

24             THE COURT:  All right.  Going to take about a

25   three-minute recess, please.

1          THE CLERK:  Court stands in recess.

2          (Whereupon a recess was taken from 11:14 a.m.

3           to 11:16 a.m.)

4          THE COURT:  Okay.  Rafil A. Dhafir, the Court

5    has reviewed and considered all pertinent information

6    including, but not limited to, the presentence investigation

7    report, the addenda, the submissions by counsel, I've

8    considered the factors outlined in 18 U.S.C. 3553(a) and the

9    Sentencing Guidelines, and I adopt the factual information

10   contained in the presentence report and the addenda.

11          Now the Court applies the six-level

12   enhancement to the money laundering counts under 2S1.1(b)(1),

13   for promoting a national security offense.  Likewise, the

14   Court finds that the Level 26 under 2M5.1(a)(1) is

15   appropriate on Count 1.  The Court bases this conclusion on

16   the trial testimony and the jury verdicts of guilt on counts

17   relating to IEEPA violations.  The Court does not rely on the

18   notes and the other documents not admitted into evidence to

19   which defendant objects.

20          Now the Court finds the total offense level to

21   be 41, the criminal history category is I, and the guideline

22   imprisonment range is 324 to 405 months.

23          The Court has considered the relevant factors

24   in Section 5K2.0 of the Sentencing Guidelines, and finds that

25   this case is not outside the heartland of cases.  The Court

1    denies defendant's motion for a downward departure.

2                 The Court must now consider the applicable

3    guideline sentencing ranges as well as the other factors that

4    are listed in 18 U.S.C. 3553(a).  These factors include the

5    pertinent Sentencing Commission policy statements, the need

6    to avoid unwarranted sentencing disparities, and the need to

7    provide restitution to victims as well as the requirement

8    that judges impose sentences that reflect the seriousness of

9    the offense, promote respect for the law, provide just

10   punishment, and afford adequate deterrence and protect the

11   public.  Also, the Court shall impose a sentence sufficient,

12   but not greater than necessary, to comply with the above

13   stated purposes of 3553(a).

14                In considering the 3553(a) factors, the Court

15   recognizes that this defendant has never been involved with

16   the criminal justice system in his 57 years.  Additionally,

17   the Court cannot overlook the highly favorable conduct of the

18   defendant in the past.  I have received many, many letters,

19   overwhelming majority of which praise the defendant for his

20   care to his patients and to their families.

21                The defendant has had a very positive

22   influence within the Muslim community of Central New York.

23   He has not only been a leader within the Muslim community,

24   but he was the moving force behind the building of the mosque

25   in Syracuse.  It is unquestioned that he gave guidance,

*USA v. Rafil Dhafir Sentencing*                                    39

1    shelter, clothing, jobs, and assisted in furthering the

2    education of several newly arrived immigrants from the Middle

3    East.

4                The Court is not unmindful of the fact that

5    this defendant now stands before the Court stripped of his

6    stature within the community, never to return to his practice

7    of medicine, and knowing that his finances and assets are

8    subject to forfeiture by the Government.

9                As such, it is the opinion of this court that

10   a term of imprisonment of 27 to 30 -- nearly 34 years is not

11   necessary to carry out the purposes of 3553(a).  Taking into

12   account all the required factors, the Court finds that the

13   purposes of 3553(a) are satisfied by a sentence below that

14   recommended by the Guidelines.

15               Accordingly, upon your conviction by jury

16   trial of Counts 1, 2, and 4 through 60 of the fourth

17   superseding indictment, it is the judgment of this court that

18   you are hereby committed to the custody of the Bureau of

19   Prisons to be imprisoned for a term of 264 months.  This

20   consists of the following:  Terms of 240 months as to each of

21   Counts 2, 4 through 14, and Counts 53 through 60; terms of

22   120 months as to each of Counts 24 through 49; terms of 60

23   months as to each of Counts 1, 15, 17 through 23, and Counts

24   50 through 52; and a term of 36 months as to Count 16.

25               The terms on each of Counts 2, Counts 4

1    through 14, Counts 16 through 49, and Counts 51 through 60

2    shall all be served concurrently with each other.

3                   The terms on each of Counts 1, 15, and 50

4    shall be served concurrently with each other and, on each of

5    which, 24 months shall be served consecutively to the 20-year

6    terms imposed on Count 2, Counts 4 through 14, and Counts 53

7    through 60, for a total term of imprisonment of 264 months.

8                   The Court reserves decision on the issue of

9    restitution.  The Court will consider any submissions

10   received on this issue on or before November the 11th, 2005.

11                  Upon release from imprisonment, you shall be

12   placed on supervised release for a term of three years.  This

13   consists of a term of three years on Counts 1, 2, 4 through

14   15, and Counts 17 through 60, and a term of one year on

15   Count 16, all such terms, again, to run concurrently.

16                  While you are on supervised release, you shall

17   not commit another federal, state, or local crime, and you

18   shall comply with the standard conditions that have been

19   adopted by this court, and you shall comply with the

20   following special conditions:

21                  One, you shall provide the probation officer

22   with access to any requested financial information;

23                  And secondly, the Court has reliable

24   information which indicates you pose a low risk of substance

25   abuse, so the mandatory drug testing in your case is -- that

*USA v. Rafil Dhafir Sentencing*                              41

1    condition is suspended.

2              It is further ordered you shall pay to the

3    United States a special assessment of $100 on each count for

4    a total of $5,900 which is due immediately.

5              So you are remanded at this time to the

6    custody of the United States Marshal in accordance with the

7    terms of this sentence.

8              Now both parties do have the right to appeal

9    this verdict and sentence, in certain limited circumstances.

10   You are advised to consult with your attorneys to determine

11   whether or not appeal is warranted.  Any appeal must be filed

12   within 10 days of this sentence.  Mr. Cannick, will you

13   assist him in that regard?

14             MR. CANNICK:  Yes, your Honor, we will file

15   the necessary papers.

16             THE COURT:  All right.  That concludes this

17   matter.  Good luck to you, sir.

18             MR. CANNICK:  Your Honor.

19             THE COURT:  Yes.

20             MR. CANNICK:  As the probation report

21   indicates, Dr. Dhafir has no family other than Mrs. Dhafir in

22   the Central New York area, community, Muslim community.

23             THE COURT:  I'm going to make the

24   recommendation to the Bureau of Prisons that they do house

25   him in the closest facility to his home.

*USA v. Rafil Dhafir Sentencing*                                    42

1          MR. CANNICK:  Yes.  And your Honor, hopefully

2    they would view that as the Otisville facility, we know

3    that --

4          THE COURT:  Otisville?

5          MR. CANNICK:  Yes.

6          THE COURT:  As opposed to Lake Placid?

7          MR. CANNICK:  Lake Placid in terms of

8    Mrs. Dhafir being able to drive there, from my experience in

9    driving there --

10          THE COURT:  Easier ride, I understand.

11          MR. CANNICK:  -- more dangerous ride.

12          THE COURT:  I will recommend to BOP that they

13   house your client at Otisville.

14          MR. CANNICK:  Thank you very much.

15          MR. OLMSTED:  Your Honor, I just have a

16   question, and I'm not asking you to rethink it, but did you

17   impose a fine or did you find that no fine was necessary?

18          THE COURT:  In regards to a fine, I find a

19   fine isn't warranted in light of the financial situation of

20   the defendant, and also interest on the judgment is suspended

21   in this case.  Thank you for pointing that out to me.

22          MR. OLMSTED:  I have one more thing for the

23   record, your Honor, if I may.  It was our intention had

24   restitution been ordered today to be put into a final

25   judgment, that we would dismiss the forfeiture and the

1   remaining counts against Help the Needy and Help the Needy

2   Endowment, Inc. and we will do so once the judgment is filed

3   in this case, without any further argument or presentation.

4   As you know, Help the Needy and Help the Needy Endowment,

5   Inc. have been subsumed by the New York State Attorney

6   General's Charities Bureau and so they have no real corporate

7   existence anymore.  The remaining charges will be dismissed

8   as soon as the judgment -- we will seek to dismiss it.

9                    THE COURT:  All right.

10                   MR. OLMSTED:  Other than that, we're done.

11                   THE COURT:  Thank you.

12                   THE CLERK:  Court stands adjourned.

13                   (Court Adjourned, 11:25 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4               I, JODI L. HIBBARD, RPR, CRR, CSR, Official

5    Court Reporter in and for the United States District Court,

6    Northern District of New York, DO HEREBY CERTIFY that I

7    attended the foregoing proceedings, took stenographic notes

8    of the same, and that the foregoing is a true and correct

9    transcript thereof.

10

11

12

13

14

15

16

17                        _____

18                        JODI L. HIBBARD, RPR, CRR, CSR
                          Official U.S. Court Reporter
19

20

21

22

23

24

25